We will call our last case of this afternoon, numbers 16-1650 and 1651, Fields v. City of Philadelphia et al. and Garaci v. City of Philadelphia et al., Ms. Tack Cooper and Mr. Gottlieb. Take your time setting up, we're in no hurry. May it please the court, Molly Tack Cooper of the ACLU of Pennsylvania for the plaintiff's appellants Richard Fields and Amanda Garaci. I'd like to reserve three minutes for rebuttal, please. You certainly can. I'd like to start by discussing why this court should rule on the constitutional question in this case and recognize that the First Amendment protects the right to record the police before moving on to the issues of... When you say record, do you mean both photograph and videotape? Yes, Your Honor. Do you make a distinction between the two or not? We do not, Your Honor. For the purpose of your argument, when you say record, you're referring to both mediums? Yes, photographs, audio recordings, video recordings. I'd like to start with that issue before moving on to municipal liability and then qualified immunity, if that structure works for the court. What type of First Amendment right do you wish us to come down in your favor? A peripheral right of expressive conduct or a right of access or both? Both, Your Honor. Certainly, recordings of anything, we believe, are protected by the First Amendment because they are inherently expressive. Photographs, videos, audio recordings, they need not be of public officials to enjoy the protection of the Constitution. But the right is even stronger here because we're talking about recordings of police officers performing their duties in public. And I take it you would agree that there can be reasonable time, place, and manner restrictions? Absolutely, Your Honor. No First Amendment right is absolute. And what type of time, place, and manner restrictions would you suggest would be reasonable? This Court certainly need not decide that today in order to reverse the ruling. Got it. Just like the First Circuit didn't decide it. But if you were just thinking this through, this is a discussion. Yes. What type of time, place, and manner restrictions would you suggest would be reasonable? Well, it would depend on the reason a particular restriction was adopted, Your Honor. The test, of course, for time, place, and manner restrictions is, is it a content-neutral restriction? Is it narrowly tailored to a significant government interest? So what purpose the restriction serves? Let me try it this way. Do you make a distinction between a car stop on Interstate 95 at night and the young man walking down the street at Temple University with a young lady videotaping at the convention center? There could be safety concerns implicated by recordings during a car stop that aren't present when you're talking about a police interaction on a sidewalk. Certainly the traffic stop context seems significant to the Kelly Court when it held that there was no clearly established right to record the police during a traffic stop in 2007, although it's not obvious that the right to gather information about how government officials use their power is any different when you're talking about a car stop. So I don't concede that every restriction involving a car stop would survive scrutiny, just that the calculus would be different than what we have here where both plaintiffs were observing interactions out in public on public sidewalks. Let's come back to my question and unpack it. What would be an example of a proper or reasonable time restriction? I could imagine a court... I want you to put yourself in the position... you're writing this opinion. Yes. You can't duck it for the moment. Yes. I agree. I agree the court should not duck the constitutional question here. I'm not sure it has to reach... I got you. Okay. So what would be a reasonable time restriction? It's hard for me to imagine time. I can imagine place and manner a little better. Certainly I can imagine that police officers, they need a certain amount of physical space around them to feel secure doing their jobs. The existence of a right to record the police does not imply a right to stand right next to a police officer and record. I can imagine restrictions on the use of a flash photography, again, for safety reasons. Time is a little harder for me to imagine how that might come into play. But again, we're not asking the court... We often use terms very quickly, time, place, manner. And yes, I can think of some places, and I can certainly think of some manner. For example, if you have an officer who's placed as a confidential informant and you're photographing that particular officer as part of an arrest, and it could put that person's life in danger. I'm having trouble thinking of a proper time one, but maybe there is. I'd like to have somebody think it through with me. I'm afraid I don't have a good restriction on time in mind, for your honor. Okay, let's go to place. Okay. It's got to be a public place, right? Not necessarily. I think this court's analysis in Whiteland Woods is helpful. The issue before us today, technically, is filming or doing photographs of a police officer during the public portion of a police officer's job in public. Yes, your honor, that is the scope of the right that we are asking the court to recognize today. The right to record police officers performing their duties in public. But so, place, where would you find reasonable restrictions as to place then? Your honor, I tend not to approach this from the perspective of imagining all the ways that a government might be able to infringe on the right. If you do write the opinion that you're looking for, we maybe want to suggest as to what can and can't be done. What I would write in that opinion is that the analysis of whether a particular restriction is permissible is very fact-specific. And I think all parties are agreed that the time, place, and manner, and the framework that goes along with that certainly would apply to this right. How that would shake out under any particular set of circumstances is not something the court needs to decide in writing this opinion. And I want to emphasize that the existence of a First Amendment right is not disputed here. The defendants don't defend the decision below. And indeed, Philadelphia Police Department policy, since 2011, has prohibited retaliation for recording the police. And since 2012 has expressly identified this as a right protected by the First Amendment. But you've also got a district judge here, who's quite good, who found in this case that there wasn't even a constitutional right, let alone one that was clearly established. In that context, how can we possibly say that every reasonable official would understand this is a clearly established constitutional right? Turning to the qualified immunity question, I believe that, well, let's start with Kelly v. Borough of Carlisle in 2010, which held that at the time of Brian Kelly's arrest, May 2007... And that was a traffic stop. Yes, it was a traffic stop, and it was also in 2007. And the case law at that time that the court surveyed included two courts of appeals that had recognized a right to record in passing, but with not a tremendous amount of analysis, dictum from this court's decision in Gillis that there may be a right to record, two district court opinions, one of which said there was no doubt that there was a right to record. But on the whole, the court concluded that that authority was not sufficiently analogous to put an officer on notice that there was a clearly established right in 2007 in a traffic stop context. Turning to our case, we have that pre-Kelly authority that should have raised concerns and suggested caution to the defendants here. You're saying we can't change it today. We're not asking you to change the outcome in Kelly, Your Honor. But since between 2007, the arrest at issue in Kelly, and 2012 when Ms. Geraci was restrained, we have thorough analysis from the First Circuit in Glick and the Seventh Circuit in Alvarez, an unbroken line of decisions recognizing that there's a First Amendment right to record the police. No court of appeals, and to my knowledge, no district court has held that there is no, other than in this case, has held that there's no First Amendment right to record the police in public. That additional precedent put the question beyond debate. And perhaps even more important, also in that interim, we had a statement from the Department of Justice that the First Amendment protects the right to record the police, and two internal departmental policies on this issue. So you have the Directive, I believe it's Directive 145, and you also have the memorandum in September of 11. Yes, Your Honor. Are you arguing that that should, that gets you over qualified immunity? Yes, Your Honor. I have three cases where either this court or the Supreme Court look to either Department of Justice guidance or internal policies as being relevant and indeed important to the qualified immunity analysis. But the problem is, after that, you have the non-presidential opinion of our court in True Blue Auctions that says it's still not clearly established. Yes, Your Honor, that was a non-presidential opinion writing solely for the parties, of course. It also dealt with an October 2009 arrest, which was before Glick, before Alvarez. It didn't involve an officer acting in defiance of his department's own policies. It was before the Department of Justice guidance in Sharpe. All of that, the Department of Justice guidance, the internal policies, the pre-Kelly precedent, the expansion on the doctrine by the First Circuit and Seventh Circuits, and changes in technology in society since 2007, all of this serves to give the officers in this case fair notice and clear warning that there's a First Amendment right. What about the Fifth Circuit case about a week ago where the officers were, similar issue, and then they did find qualified immunity against the Turner case? Yes. Well, importantly, they did acknowledge that there's consensus on the question of whether there is a First Amendment right to record. But they did find qualified immunity for the officers. Yes, and I believe they erred, Your Honor. They relied on holdings in other qualified immunity cases from the Fourth Circuit, which actually takes a different approach to qualified immunity than this circuit. Kelly, this, of course, decision in Kelly and a non-presidential opinion from the Tenth Circuit, but the court in Turner didn't analyze the time of arrest at issue in those other cases. Are you familiar with any case where the qualified immunity was not found? Any case where, certainly, Your Honor. This... I'm talking about First Amendment videotaping of police where the officers were not protected, as it were, by qualified immunity. The First Circuit's decisions in both Glick and Gehrke, which was a traffic stop case in 2014, found not only that there was a First Amendment right, but also that it was clearly established. The... The Fifth Circuit didn't. What did Alvarez do to slow the Seventh Circuit case? I don't believe Alvarez actually addressed qualified immunity. It was a facial challenge to a statute. I don't believe that qualified immunity actually came up in that case, so it wasn't addressed. And what happened in Fordyce, the Ninth Circuit case? It's not clear, actually, whether the Fordyce court ruled on qualified immunity for the First Amendment claim. It granted qualified immunity on 1983 claims arising out of an arrest under a privacy statute, which definitely included a Fourth Amendment claim. I would say that the analysis there is muddy, but the Ninth Circuit in Adkins found that there was a clearly established right to photograph an accident scene involving police. That was in 2013, another Ninth Circuit. We'll go back to the issue of the directors versus the cases. So if you're the police commissioner or you're a police officer on the street, do you look to the directors or do you look to the case law to determine what rights are clearly defined I mean, I think it is much more likely that an officer would be familiar with his departmental directives than that he would have surveyed the federal court's jurisprudence, which is why this court and the U.S. Supreme Court have said that these internal policies are significant to the qualified immunity analysis here. I think they absolutely changed the calculus from what we had in Kelly. I'd like to perhaps turn to the municipal liability issue, as I see my time is... Yeah, did you reserve any time for rebuttal? Sorry? Did you reserve time for rebuttal? Three minutes, Your Honor, yes. Okay. In this case, we have a breathtaking amount of evidence that the Philadelphia police had a pattern of arresting or citing people for recording or attempting to record the police, and that that evidence was known to city policymakers, and that in response they failed to do anything other than draft paper policies. Well, the memorandum was read to all officers verbatim. The directive, which I assume is an even more mandatory document, like, you must do this, this is an order, they got that. It seems like really the only argument you have is that somehow they didn't train people, and that's a tough case to make, isn't it? It's not because we have... What you're citing here almost sounds like, okay, there's some people that go rogue on you a little bit and don't follow the policy, but in a 6,500-person force, that happens daily. But we also have the 30B6 testimony of the city, Captain Healy's testimony, that he knew that getting officers to understand that there's a right to record the police would take, quote, cultural change, which would require training. And that's what Captain Healy and the commissioner were attempting to do. No, well, actually Captain Healy testified that the department did only roll call readings and that roll call readings are not training. What do you make of Captain Healy's memorandum of December 18th where he says PPD could have done more training? I think that the defendant's position is that... What's your position? I understand their position. What's your position with respect to that admission that the training fell short? I think that if Captain Healy could view our failure-to-train claim this way, then so could a jury, Your Honor. The defendants on appeal have argued that the existence of Memorandum 1101 and Directive 145 essentially answer the whole question here. And in light of Captain Healy recognizing that there was some credence to our failure-to-train claim, I think it's clear that that claim should go to a jury. Is there an admission by Healy where he says it became very clear that PPD could have done more training? Is there an admission? We didn't move for judgment on that claim in light of that statement, Your Honor. I think it is probative and hopefully it will help prove our failure-to-train claim. But the district court didn't rule on that, correct? Correct, Your Honor. And so at best, wouldn't all you get is a remand? Your Honor, I don't think a remand is necessary here because these are all pure questions of law and we have a thoroughly developed record. You're asking us to take, for example, a memorandum and as a court of appeals to make a finding of fact, which you know we can't do. You don't have to make a finding of fact, Your Honor. You only have to rule that there is enough evidence in the record that if construed in the light most favorable to the plaintiffs in this case, could establish our claim. So all you have to do is remand with instructions that the case proceed to trial against all defendants, Your Honor. Was all the evidence in that might relate to Ronell liability? We believe it's a sufficient and thorough record, Your Honor. This was dismissed at 12-B-6, right? Summary judgment. Summary judgment. So it was 56, okay. Yes. Why don't we hear from Mr. Gottlieb and we'll get you back to her. Thank you, Your Honor. May it please the Court, Your Honors. Craig Gottlieb representing the appellees. With the Court's permission, I'd like to focus first on qualified immunity and then focus on municipal liability. Well, let me ask you, are you willing, what's your position? Is there or is there not a right first and foremost? Is there or is there not a right to videotape police officers? Your brief kind of dances around it. And our threshold position is that the Court need not reach that issue. Got it, got it. What's the city's position? What's your position? The city's position is that on the idiosyncratic facts of this case, there is no right. This case is an unusual case because what the plaintiffs are asking for and I… What is idiosyncratic about a sophomore at Temple taking out his cell phone and shooting an arrest being done? That happens throughout America probably every minute. Right. Or a woman in a protest, I'm not sure it was a protest, a demonstration of sorts videotaping police officers. What's idiosyncratic about any of that? It isn't the fact that they're idiosyncratic, Your Honors. It's the way that the plaintiffs have framed the argument. The way that the plaintiffs have framed the argument is that any recordings of any type under all circumstances are always protected. Did Mr. Fields have a First Amendment right to take that picture, yes or no? Mr. Fields did not. Did not? Did not. Did not? Did not. Did Ms. Garcy have a First Amendment right to videotape the police officers under those circumstances, yes or no? Hers is a tougher case. Yes or no? She probably did. She probably did. So the young man did not have a First Amendment right? He's on a public street. He sees an arrest taking place. He's got nothing to do with it. He takes out his camera and he does not have a right to film that? The police are doing a public job on a public street. That's right, Your Honor, and it has to do because of what he intends to do with the picture. He's keeping it for himself. Isn't that in direct violation of the Commissioner's own memorandum from 2011 and own directive from 2012?  It violates the Commissioner's memorandum. You're saying it's tethered to his intent as to what he's going to do with the picture? Yes. Really? Yes. What's your support for that? Well, I mean, the support for that is that if he— What's your support for the premise that First Amendment rights are tethered to somebody's intent? Under that, what case law support? I guess the case law support would be Tenafly or Troster or cases like that, that if he's not— Tenafly is symbolic speech. I mean, I wrote that opinion. I understand, Your Honor, and— This is a cool picture. I want to take a picture. He wants to take a picture for himself. He's not planning on—I mean, there's no evidence that he's planning to disseminate it. That's the touchstone of our argument here. So First Amendment's tethered to your intent to disseminate the information? Correct. So basically what you're suggesting, if I gather it correctly, is there somehow has to be in his mind some type of expressive communication intent. Correct. And that's what Judge Kearney said here. Correct. There ain't any other court in America that's come down that way. Well, again, I think that the way that the issue has been framed is unique. The intent in other cases—I mean, the intent in other cases is more self-evident. Even in the DOJ's amicus brief, who takes this out of the plaintiff, they call this a case of first impression. So in the other cases, the intent to express was more self-evident. So how is Ms. Gorsy's position different? You say that she probably had a right to do it. It's harder to separate Ms. Geraci's position. It is. I think that the plaintiffs don't argue it this way, but Geraci and Fields are in separate postures, I believe. Why? Because her expressive intent is easier to discern. What is her expressive intent? She wasn't saying anything. She was just there monitoring a demonstration, as it were. In fact, I think she called herself merely as an observer, right? She called herself a legal observer, I believe. Because it sounds as if—I mean, let's go back 25 years ago to 1992, and you've got Rodney King being photographed being beaten by four police officers. You don't think for a moment that that's not going to hit the news, which it did, of course. And so isn't the right to film, which is an integral link in the ultimate giving of that film to the news media, protected as being peripheral, even if it is expressive intent that's needed, or expressive conduct that's needed, excuse me? I would say because of the expressive conduct, it's protected, yes. Well, we don't know if Mr. Fields was going to give this to the news media. It might be on Channel 10 tonight, that very night, because that's how often the news media, all the channels here, are asking people in the community who see something to give them that type of information, because it's a scoop for them. They don't have reporters on the scene, and they're not necessarily going to have reporters on the scene. So why isn't that a link in the chain to the 10 o'clock or 11 o'clock news tonight? Well, if it is a link in the chain to the 10 o'clock news, then it is expressive. But if it's a diary or one's own internal thoughts... This kid's not doing a diary. He's filming an arrest on a street in North Philly. We have no idea about that. How do you reconcile your argument or your position with your client's position? I'm reading from the Philadelphia Directive 145, Policy A. Private individuals have a First Amendment right to observe and record police officers engaged in the public discharge of their duties. That's what your client's saying. Right. You tell me that they're wrong? The commissioner doesn't speak for the constitutionality of the actions. We completely agree with the policy of doing that. Everybody's on the same page there. But in terms of the constitutional right, that comes from the court, not from the commissioner. In a year earlier, the commissioner, Ramsey, is saying that all police personnel while conducting official business or while acting in an official capacity in any public space should reasonably anticipate and expect to be photographed, videotaped, and or audibly recorded by members of the general public. Yes. You hate to turn a good deed back against the police department because that's clearly the trend today. And maybe the commissioner was a bit ahead of the time. But isn't that where we are today in the First, the Fifth, the Seventh, the Ninth, and the Eleventh Circuits, that you have a constitutional right to film police officers doing the public portion of their job in public? I'm not sure that all those cases do find a right. I'm not sure that any one of those cases spoke to the question that I'm, the narrow question that I'm talking about here, where there's no evidence that you want to do anything except keep it for yourself. That's a unique pattern. What about the other theory that it's in effect a right of access of the public to information? Your Honor, a few responses to the access point. Point number one is that I think access itself, the right of access itself, is part and parcel with dissemination. It's access and then divulge. Number two, if we are talking about just a right of access, this court itself has defined the right of access in Wetland Woods. And in Wetland Woods, the court itself said that access means you get to look and see and then take notes and do something like that. But Wetland Woods specifically said that you don't also then have the right to videotape as well, as long as you get access. Nobody here was denied access to witness what happened. It was the subsequent videotaping, so it was on par with Wetland Woods in that capacity. But hasn't the world changed dramatically just in the last five years? Don't you have police cams? And I think the thought is, at least from what I've read with regard to police, this protects us. When we're doing our job and somebody is saying something about how we handle a case, we've got to videotape to show that we've done it correctly. I do see the trend, I do understand it, and I do see that there are lines that I'm recommending that are difficult to draw. However, where there's no testimony at all that there is a plan to disseminate, and that is the situation with Mr. Fields. He thought it was a cool picture. All we know is that he planned to keep it himself, no different than a diary. So if he had said, I'm going to show this to my fraternity brothers or to my brother, then the First Amendment attaches? Then it's different than a diary, yes. That's the point. As I listen to your argument, Councillor, I'm wondering about this intent to disseminate. I'm wondering what would have happened had Zapruder thought, what was in Zapruder's mind when he took that eight-millimeter film of the assassination of President Kennedy that had become the most famous eight-millimeter film in the world? What would have happened under your theory if he had been stopped because he had no plan to disseminate it? At that time. At that time, when he took it. If he had been deposed and said that there was a possibility of dissemination, that would be different. I'm really limiting the argument to just the diary. In Mr. Fields' case, there is that possibility. He could see something. It could be on the news that night. We just talked about it. I'm sorry. Mr. Fields, he filmed something, and he's thinking, you know what, this could be on TV tonight. I could be getting credit for this, too. Life is good. If he was thinking that, that would change the calculation. Doesn't it trouble you that, taking your argument to its logical extreme, that none of us, none of us have a First Amendment right unless we intend to disseminate the information? That's what you're telling us. If you're asking me whether I'm troubled by the fact that a diary is not the First Amendment. The First Amendment is gone unless you're going to disseminate the information. Unless you intend to disseminate the information at the time of taking the film. Is that your position? If you ultimately, if it's for yourself only, it's not the First Amendment. You have no First Amendment right. That's your position. Yes. Okay. May I move on to the… Well, yeah. I think you're a little more solid ground on the qualified immunity. What's your argument? Thank you, Your Honor. Our primary point on, the plaintiff's primary argument is that after Kelly, the law changed, and it changed with Glick, and it changed with Alvarez. There are several problems with that, Your Honor. First of all, True Blue postdated both Glick and Alvarez. It would put a… True Blue is not presidential, however. True Blue is not presidential. You're right about that, Your Honor. The issue is whether an officer has fair notice of the law. What about the directives? And the memorandums that told the police officers, folks have a First Amendment right, members of the Philadelphia Police Department. And they're read to you before you go on duty, verbatim. Yes. It's almost like Hill Street Blues. Well, I think what we're talking about is the memorandum, I'm sorry, the directive itself. The memorandum doesn't articulate a constitutional right. It says what the officer… The memorandum told police that they should expect to be videotaped and not to interfere with any such actions. Yes. And then you get the directive about a year later. Yes. And that clearly says that these folks have a First Amendment right to do this. Does that defeat qualified immunity? I don't think so, Your Honor, because several months after that, True Blue comes down. The directive is November 2012. True Blue is… Well, the Fields was after that, correct? Fields was after True Blue. Was True Blue a Philadelphia Police Department case? No. No, it was not. So those police officers weren't given the same instructions as the Philadelphia Police Officers? I don't think so, no. Because here we have evidence. If we accept that they were told repeatedly that there's a First Amendment right for the civilians to videotape you. They were told that. But, again, the commissioner doesn't articulate what the law is. The court articulates what the law is. And in June of 2013, the court was unclear what the law was. And it would be unfair to hold an officer of greater accountability than the court itself could find. And there's been several other precedents, such as Turner, that have also articulated it as unclear. Turner didn't have the directive issue. But if you're an officer and you see the directive, and then after that the court essentially says we're not sure if the law as stated in the directive is correct, that's not fair notice to the officers. So… Go ahead, Dick. Counselor, do you have any authority for your argument that the delineation of whether it is clearly established or not must come from the court? Or can it be actually established? What authority do you have for the fact that it must come from the court? Well, I don't – I mean, I think that that's sort of the baseline, that that's how clearly established law is. It's called clearly established law. It is defined by the courts. I do understand that there can be other factors that weigh into the calculation. A clearly established law is a clearly established right. Have you read Mills v. Alabama? I have not, Your Honor. I would suggest you do. Okay. But my point, Your Honor, is that no matter how – no matter what the directive says, we know that there's law that comes out after that. We know that there's a lot of law that comes out after that that's unclear. I want to emphasize one other point. This is from a law review article by one of the law professors that's in the MICI in this case. It's in her brief, but Professor Simonson, she says, in 2015, district courts within at least five different circuits held that there is not yet a clearly established First Amendment right to record police activity in public. A finding that results in qualified immunity for police officers accused of violating their right. So this is by plaintiff's ally. But on the road where we are on now, you can see that in five years' time, that is not going to be the law, I would bet you, in any single circuit. That will be the law, I should say, in every single circuit. It seems to be heading in that direction, Your Honor. So what's to stop us from saying that this is a clearly established right today, or this is a constitutional right today, and then you have to say with regard to these particular officers, it wasn't clearly established at the time they did their jobs that caused them to be brought into these suits? There's nothing that stops you from doing that, Your Honor. I mean, we have arguments, but you can... No, but your argument is that these particular officers, no matter what you decide with regard to the constitutional right, these particular officers should get qualified immunity. Absolutely. But then in the future, no officer can say that I get qualified immunity because the right's not clearly established if we now say that there is a constitutional right. Correct. All right. Correct. It would essentially mirror the Turner decision, is what I hear you saying. What do we do with the Monell case? The court should ultimately affirm entirely, because there is no place having proven a policy, and I wanted to point to a couple things, Your Honor. What they're saying is that, yes, there is a memorandum. Yes, there is a directive. But by Captain Healy's own admission, they fell down on the training. So let's talk about that admission. I think that admission is very telling. The admission is on page 335 of the record, and I want to quote a couple parts of that. Captain Healy did say there is some credence in the plaintiff's failure to train argument. He said there was credence to it. And, fortunately, that's perhaps troubling, but let's talk about that. That is a legal determination, so that's not ultimately up to Captain Healy. But let's look at the basis for what was the basis for the statement that there was credence for it. The basis was the facts in each of the lawsuits occurred after the effective dates of both the memorandum and Directive 145. The lawsuits that we're talking about are Lowe, Fleck, and Montgomery. The lawsuits brought by my colleagues here, the same plaintiff's lawyers. They brought the same lawsuits. And what they will know, and what Captain Healy didn't appreciate, is that the facts in each of the lawsuits occurred before the effective date of the memorandum and Directive 145. He made a fact mistake. And that's where this error comes from. The reality is that after the memorandum, I'm sorry, after the directive was issued. This is 2012. In November 2012. Plaintiffs have pointed to a total of two instances of violations of the directive. One in December of 2012 and one in March of 2013. And then the Fields one. So if you count Fields, there's a total of three. Across 6,500 police officers likely being recorded all the time, there's a total of three violations. That's it. That is the entirety of their record post-directive proof. That's not a custom. And even if that were a custom, they certainly haven't proven that there was deliberate indifference to that custom. Because as the record shows, every time Captain Healy had the opportunity to fix something, he fixed it. There ultimately isn't really anything to fix now except these two situations. And he's trying to be a perfectionist about it. And we applaud him for that. But it's certainly not deliberate indifference and it's not a violation of the Constitution. So our recommendation is that the court decide the municipal liability issue, which is presented at the summary judgment stage and rule in the city's favor on summary judgment. Did the district court rule on the Monell issue in its opinion? It did not. It did not. So ultimately for these reasons, Your Honor, we ask the court to affirm ultimately on qualified immunity and on lack of municipal liability. One final question that I have, and then we'll ask Judge Lankard if he has any further questions. If we do rule that this is a constitutional right and we've often seen that there is the standard language that's subject to reasonable time, place, and matter restrictions, what type of restrictions would you like to see in the opinion, if there are any listed? Certainly, obviously we would like to see the right limited. Safety concerns, traffic stops, things like that, items like that need to be excluded. Every traffic stop? Just to digress for a second. If I'm across the street and a police officer is doing a traffic stop, how is that a safety concern for the police officer if I am filming? Remember, most likely the police officer has his cam on anyway. If you're not involved in the traffic stop, it's hard for me to see how there's a safety concern. So it wouldn't be every traffic stop? I was thinking of individuals involved in the traffic stops, correct. It would not be every traffic stop. Should we limit it to the police? Should it go broader than the facts in this case, the police in the public and police performing their duties in the public? It's a little bit hard for me to answer this question because we have a position that the right isn't in place. I understand that. I said conditionally, if. I understand. So you have a chance to influence the opinion if we decide to address that particular, those types of prophylactic restrictions that may be helpful to police officers in the future. Yes. So I would reiterate that it would be the facts of this case are a good example where a police officer is performing duties. The facts of this case? You think they should be off limits? No, no. If the court's going to recognize a right, the facts of this case are a good example of where the right would be recognized. Okay. I apologize. And specifically, it's a police officer performing his duties or her duties in public. All right. Judge Lagarde, do you have any further questions? I have none. Thank you. Thank you very much, counsel. Thank you. Ms. Tack-Hooper. Thank you, Your Honors. I have four points I'd like to make. Your Honor's questioning regarding the decision below really highlights many of the problems with that opinion. The only thing I want to add on the actual First Amendment question is that my co-counsel reminded me that the city's own policy, Directive 145, contains a good outline of some appropriate restrictions on the right to record. It's at JA 1187. It's Section 3B of Directive 145, and it's just a paragraph long, but it lays out some limitations on the right to record that we concede are appropriate. Turning to the qualified immunity issue, I have two points. I mentioned that there were three cases that permit the consideration of DOJ guidance and internal policies. I wanted to just name those for you. It's the Supreme Court's decision in Hope v. Pelzer where the court relied on a DOJ report, indicating that it was an Eighth Amendment violation to use a hitching post. The Supreme Court's decision in Wilson v. Lane, where the court said that a martial service policy pertaining to the challenge practice was important to the conclusion. In that case, the qualified immunity was warranted. And this court's decision in Williams v. the Secretary of the Department of Corrections, where the court said that internal DOC policies, quote, bear on whether the right at issue was clearly established. Can I go back to the point you made with regard to paragraph 3B of JA 1187? Are you saying that these are good restrictions, reasonable restrictions? Because it says here, individuals do not have the right to report police by doing so they jeopardize the safety of the officers, fine, any suspects or any individuals in the immediate vicinity. Violate the law. What if there's a law that says in Philadelphia that you shall not do any type of photographing of a police officer during an arrest? That would be a violation of law. That is certainly why we need the court to recognize the constitutional right here, so that such a law could not be passed. My point is, you're not agreeing that these are reasonable. I actually understood that reference to violating the law to be telling police officers that they don't have to ignore violations of the law simply because someone is recording. It doesn't confer immunity. But the restrictions we were referring to were the safety ones. The other qualified immunity issue that I wanted to raise, counsel for the defendants mentioned that True Blue postdated the First Circuit decision in Glick and the Seventh Circuit decision in Alvarez, and later referred to district courts' ruling in 2015 that qualified immunity was warranted. I really want to emphasize that the relevant question here is whether the law was clearly established at the time of the incidents, not at the time that the court was ruling on the issue. So True Blue, it came down after Glick and Alvarez, but it dealt with an arrest in 2009. So the court was, of course, surveying the case law in 2009, not at the time that it issued the decision. And finally, on the Monell issue, counsel for the defendants agrees that this court does not need to remand to let the district court rule on municipal liability in the first instance. Yet he wants to go the other way in terms of resolve. That's true, but we are at least in agreement that the district court doesn't need to rule first. We, of course, would ask that the court reverse the grant of summary judgment and remand with instructions that the case proceed to trial against all defendants. If there's nothing further, Your Honor. Technically, I guess it would be vacating the decision, correct? Maybe it would be reversed. I don't know. I defer to your judgment on that one, Your Honor. And I would defer to the chief of the staff attorneys. Thank you very much. Thank you very much. Thank you to both counsel. We'll take the matter under advisement.